1  Roman M. Silberfeld, Bar No. 62783
   David Martinez, Bar No. 193183
2  **ROBINS KAPLAN LLP**
3  2049 Century Park East, Suite 3400
   Los Angeles, CA 90067
4  Telephone: (310) 552-0130
5  Fax: (310) 229-5800
   RSilberfeld@RobinsKaplan.com
6  DMartinez@RobinsKaplan.com

7  [Additional Counsel Listed on Signature Page]

8  *Attorneys for Plaintiff and the Putative Class*

9

10              **IN THE UNITED STATES DISTRICT COURT**

11                **CENTRAL DISTRICT OF CALIFORNIA**

12

13  1465 3RD AVE. REST. CORP. (d/b/a         **Case No. 2:15-cv-6145**
14  GAEL PUB), for itself and for all
    others similarly situated,
15                                           **CLASS ACTION COMPLAINT FOR
                   *Plaintiff*,              DAMAGES AND DECLARATORY
16                                           AND INJUNCTIVE RELIEF
17  v.                                       PURSUANT TO SECTION 1 OF
                                             THE SHERMAN ACT**
18  NATIONAL FOOTBALL LEAGUE,
    INC.; NFL ENTERPRISES LLC;
19  DIRECTV, LLC; and DIRECTV
    HOLDINGS LLC,                            **DEMAND FOR JURY TRIAL**
20
                   *Defendants*.
21

22        **CLASS ACTION COMPLAINT FOR DAMAGES AND
23          DECLARATORY AND INJUNCTIVE RELIEF**

24        Plaintiff, 1465 3rd Ave. Rest. Corp. (d/b/a Gael Pub), individually and on

25  behalf of all others similarly situated (the "Class" as defined below), upon personal

26  knowledge as to the facts pertaining to itself and upon information and belief as to

27  all other matters, and based on the investigation of counsel, brings this class action

28  for damages, injunctive relief and other relief pursuant to the federal antitrust laws,

*Left margin, vertical:* ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

demands a trial by jury and alleges as follows:

## NATURE OF ACTION

1.      Plaintiff brings this lawsuit against DirectTV, LLC and DirectTV Holdings LLC (collectively, "DirectTV") and the National Football League, Inc. and NFL Enterprises LLC (collectively, the "NFL") (together, "Defendants") on behalf of itself and a Class consisting of all restaurants and bars (the "Commercial Subscribers") in the United States who purchased the NFL Sunday Ticket during the Class Period (defined herein).

2.      The relevant geographic market is the United States and the relevant product market is the market for live broadcasts of Sunday afternoon out-of-market NFL football games ("Out-of-Market Games").[1]

3.      Through an exclusivity agreement with the NFL, DirecTV is the sole distributor of Out-of-Market Games, which it sells through its "NFL Sunday Ticket" package.[2]  This exclusive arrangement allows DirecTV to charge supracompetitive prices for the NFL Sunday Ticket.  According to DirecTV's own website:  "Only DIRECTV brings you every play of every out-of-market game, every Sunday."

4.      Every NFL member team owns the initial rights to the broadcast of that team's games.  However, each team has chosen to collude with each other and to grant the NFL the exclusive right to market games outside each team's home market.  DirecTV's arrangement with the NFL allows the Defendants to restrict the

---

[1] "Out-of-Market Games" excludes live Sunday afternoon NFL football games otherwise broadcast on CBS, Fox, or formerly on NBC within a viewer's local television market.  The definition also excludes games within the home territory of one of the NFL teams that is not aired on CBS, Fox, or formerly on NBC, due to the team's failure to sell all of the tickets to the game prior to the blackout deadline for that game.

[2] The NFL Sunday Ticket (also known as the Sunday Ticket) is trademarked by Defendants and is recognized by them as a separate product from NFL games broadcast on Fox, CBS, NBC, ESPN, and NFL Network.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

output of, and raise the prices for, Out-of-Market Games.  But for the NFL teams' agreement, in which DirecTV has joined, NFL teams would compete against each other in the market for Out-of-Market Games, which would likely induce more competitive pricing.

5.     Of the four major professional sports in this country—baseball, basketball, hockey, and football—football is the only one with an exclusive out-of-market broadcasting arrangement.  Major League Baseball ("MLB"), the National Basketball Association ("NBA"), and the National Hockey League ("NHL") all distribute their respective live out-of-market games through multiple multi-channel video programming distributors ("MVPDs"), including, for example, DirecTV, Dish Network, Comcast, Cox Cable and Time Warner.

6.     As a result of the NFL-DirecTV exclusivity agreement, competition in the market for Out-of-Market Games is eliminated and DirecTV's MVPD rivals are at a competitive disadvantage.  Consequently, DirecTV is able to extract supracompetitive rents for its service compared to prices it charges for sports packages in markets where it faces competition.  *See*, *e.g.*, Comments of Cox, FCC MB Docket Nos. 12-68, 07-18, 05-192, at 3 (June 22, 2012) ("the exclusivity deal causing the most significant market distortion today is DirecTV's Sunday Ticket package"); Testimony of Roger Noll before the Committee on the Judiciary, United States Senate (Nov. 14, 2006) ("From my perspective, if one adopts the right counterfactual, the right but-for world in the competitive environment, it is obvious that NFL Sunday Ticket is a palliative compared to the output and prices that would exist in a competitive environment.").

7.     In the United States, Dish Network, a competing satellite MVPD, has stated that "DirecTV's flagship exclusive promotion is that they are the only TV provider to offer the NFL Sunday Ticket . . . . If you want the NFL Sunday Ticket, then DirecTV wins this battle every time."  However, Dish Network promotes itself as having "more channels with a lower monthly bill" and that "Dish wins versus

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

DirecTV in the price category."  Dish Network and other MVPDs would compete with DirecTV on price and service if they were not unlawfully precluded from access to the distribution of Out-of-Market Games.

8.      The exclusivity agreement between the NFL and DirecTV is lucrative. In October of 2014, various media outlets reported that DirecTV and the NFL entered into a new telecasting deal reportedly worth $1.5 billion annually for the next eight years, a deal that will bring $8 billion more to the NFL (over four additional years) than its last deal with DirecTV.

9.      Indeed, DirecTV's ability to offer the NFL Sunday Ticket on an exclusive basis is material to its operations.  As detailed herein, DirecTV's recent merger with AT&T depended upon, in substantial part, the continued exclusivity of this service.

10.      Defendants' exclusive agreement eliminates competition by preventing other MVPDs from distributing Out-of-Market Games.  But for the exclusive agreement between DirecTV and the NFL, additional MVPDs would be willing and able to compete for consumers of these broadcasts.  Additionally, faced with competition, prices for these broadcasts would be much lower, as would the cost of DirecTV programming packages required to be purchased in conjunction with the NFL Sunday Ticket.  In addition, but for the horizontal agreement among NFL teams to sell a single package of Out-of-Market Games, those individual NFL teams would compete against each other and drive down the broadcast prices of Out-of-Market Games.

11.      The NFL is the most popular professional sports league in the United States and Commercial Subscribers generate a substantial share of their overall revenue by having the capability to televise multiple professional football games simultaneously.  The NFL Sunday Ticket particularly appeals to Commercial Subscribers that cater to NFL fans with loyalties to teams located throughout the United States.  Indeed, DirecTV specifically markets the NFL Sunday Ticket to

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Commercial Subscribers, including, for example, advertising such as: "Turn your business into the neighborhood's go-to spot with the undisputed leader in sports" and "[o]nly DIRECTV has the sports packages you need to attract fans of every stripe with NFL SUNDAY TICKET 2015 . . . ."

12.     Through this lawsuit, Plaintiff and the Class seek to enjoin under the federal antitrust laws the ongoing, unreasonable restraint of trade that Defendants have implemented through DirecTV's exclusive arrangement to broadcast all Out-of-Market Games.  Plaintiff also seeks to recover damages on behalf of itself and the Class for the supracompetitive premiums charged by DirecTV for Out-of-Market Games as a result of this unreasonable restraint of trade.

## JURISDICTION AND VENUE

13.     Plaintiff brings this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26) to secure monetary, equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).

14.     This Court has subject matter jurisdiction over this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331 and 1337.

15.     Venue is proper pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because Defendants transact business in this District, and are subject to personal jurisdiction in this District, because DirecTV is headquartered in this District, and Class members were injured in this District.

16.     The activities of the Defendants and their co-conspirators as alleged herein were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.

17.     Defendants' conspiracy and unlawful conduct described herein adversely affected the business and property of Commercial Subscribers in the United States that purchased the NFL Sunday Ticket, including Plaintiff and members of the Class.

## PARTIES

### Plaintiff

18.     Plaintiff 1465 3rd Ave. Rest. Corp. (d/b/a Gael Pub) is a bar and restaurant located in New York, New York.  During the Class Period, Plaintiff purchased the NFL Sunday Ticket from DirecTV to attract patrons to its establishment during the NFL's professional football season.

### Defendants

19.     Defendant DirecTV Holdings LLC is a Delaware limited liability company and has its principal place of business at 2230 East Imperial Highway, El Segundo, California. It is the U.S. operating arm of DirecTV, Inc. and describes itself as "a leading provider of digital television entertainment in the United States." It claims that "[a]s of December 31, 2014, [it] had approximately 20.4 million subscribers."

20.     DirecTV, LLC is a California limited liability company that has its principal place of business at 2230 East Imperial Highway, El Segundo, California. DirecTV, LLC issues bills to its Commercial Subscribers.

21.     Until 2015, the NFL was an unincorporated association of 32 American professional football teams in the United States, each of which was separately owned and operated, acted in its own economic self-interest and competed in most respects with the other NFL Teams.  The NFL teams are headquartered in various cities across the United States and are organized under the laws of various states.

22.     In or about 2015, the NFL incorporated as the Defendant National Football League, Inc., has its headquarters at 345 Park Avenue, 7th Floor, New York, NY 10154.

23.     Defendant NFL Enterprises LLC, a Delaware limited liability company, upon information and belief, was organized to hold the broadcast rights of the 32 NFL teams and license them to MVPDs and other broadcasters, including

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

DirecTV.  NFL Enterprises LLC is also located at 345 Park Avenue, 7th Floor, New York, NY 10154.

## AGENTS AND CO-CONSPIRATORS

24.    Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

25.    Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

26.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

**A.    The NFL's Broadcasting Agreements**

27.    Each of the NFL's 32 member teams gave the league authority to negotiate television deals on its behalf in exchange for an equal share of the resulting revenues.  With this authority, the NFL entered into broadcast agreements with ESPN, Fox Broadcasting, CBS and NBC.  NBC has the right to nationally broadcast prime-time Sunday night games (NBC Sunday Night Football).  ESPN has the right to nationally broadcast prime-time Monday night games (Monday Night Football).  In addition, the NFL Network—a cable and satellite network owned by the NFL— nationally broadcasts approximately eight regular season

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

games, in partnership with CBS.  These games are usually broadcast during prime-time on Thursday nights.

28.     Pursuant to their respective agreements with the NFL, CBS and Fox Broadcasting televise between ten and fifteen weekly Sunday afternoon games, which commence at either 1 p.m. or 4 p.m. Eastern time.  For the first sixteen weeks of the 17-week NFL season, on an alternating basis, one network is designated to broadcast "doubleheader" games in both time slots and the other is designated to air a single game in one of the slots.  Both networks are permitted to show doubleheaders the last week of the season.  Subject to certain restrictions for games that do not sell out, CBS's or Fox's local affiliate (as the case may be) generally must broadcast any Sunday afternoon game being played by a team whose territory falls within the local affiliate's coverage area (*i.e.*, an "in-market game").

29.     As a result of this arrangement, during most weeks of the season, only three of the Sunday afternoon games are broadcast by CBS or Fox, and the specific games available to any given viewer depend on whether the viewer is located within a team's home territory and whether that team is playing on Sunday afternoon.

**B.     DirecTV's NFL Sunday Ticket**

30.     Generally, viewers can only watch NFL games that are broadcasted nationally or within their local television market.  All other games are considered Out-of-Market Games, which can only be viewed by purchasing a special package.

31.     DirecTV began to offer the NFL Sunday Ticket beginning in 1994 pursuant to an exclusive agreement with the NFL.  Today, through this exclusivity agreement, DirecTV takes the live game telecast feeds produced by CBS and Fox and redistributes them without alteration to the NFL Sunday Ticket subscribers through DirecTV channels.  By purchasing the NFL Sunday Ticket, a viewer is able to watch any of the Out-of-Market Games.

32.    As a result of Defendants' collusive and anticompetitive exclusivity agreement, Out-of-Market Games can only be purchased through DirecTV.  This arrangement eliminates competition in the market for the distribution of Out-of-Market Games and requires anyone wishing to view these games to subscribe to DirecTV and purchase the NFL Sunday Ticket at the supracompetitive price dictated by DirecTV.

33.    DirecTV's exclusive arrangement with the NFL results in Commercial Subscribers, including Plaintiff and members of the Class, paying a higher price for the NFL Sunday Ticket (and other access charges) than they otherwise would pay if the agreement was negotiated competitively.

34.    For example, when the NFL's first contract with DirecTV for the NFL Sunday Ticket expired in 2002, several cable companies (acting as a consortium) offered the NFL $400 million to $500 million annually for the nonexclusive rights to carry Out-of-Market Games.  The NFL rejected the bid and alternatively chose to renew with DirecTV.  As a result, DirecTV was given the exclusive rights to carry Out-of-Market Games for about $400 million per year.

35.    In October of 2014, DirecTV renewed its exclusive agreement with the NFL on terms even more lucrative for the NFL and its member teams.  On information and belief, the renewal requires DirecTV to pay the NFL an average of $1.5 billion per year for eight years in return for the exclusive right to broadcast Out-of-Market Games through the NFL Sunday Ticket.

### C.    Commercial Subscriptions to the NFL Sunday Ticket

36.    DirecTV offers Commercial Subscribers "amazing exclusive sports content like NFL SUNDAY TICKET."  Having access to the NFL Sunday Ticket is valuable to these establishments.  The National Restaurant Association reports that NFL fans often stay at establishments four hours longer than other patrons and order three or more drinks.  Given how valuable Out-of-Market Games are to Commercial Subscribers, and the fact that these games are not interchangeable with

telecasts of local NFL games, the subscribers are willing to pay a substantial amount for the NFL Sunday Ticket to offer their patrons the opportunity to view multiple Out-of-Market Games.  Additionally, during the Class Period, the fact that the NFL Sunday Ticket is only available through DirecTV locked Commercial Subscribers into the DirecTV service throughout the year.[3]

37.   Defendants have taken advantage of this by charging Commercial Subscribers supracompetitive prices for the NFL Sunday Ticket.  Although residential DirecTV subscribers pay a fixed charge for DirecTV service and the NFL Sunday Ticket, DirecTV charges Commercial Subscribers fees based on the maximum occupancy permitted by the local fire code.  The least expensive package is $1,458 per season, and the most expensive runs in excess of $120,000.

38.   The prices DirecTV charges to Commercial Subscribers for the NFL Sunday Ticket have increased substantially throughout the Class Period.  Prices for the NFL Sunday Ticket increased by more than 7% this year alone.

39.   In contrast to the NFL's exclusive deal with DirecTV, the NBA, the NHL, and MLB offer their live out-of-market game packages through both DirecTV *and* cable sports networks, including, for example, various sports networks owned by Comcast.  In these markets, DirecTV does not charge nearly as much for access to MLB Extra Innings, NBA League Pass, and NHL Center Ice, which provide access to more games per week over a longer season than the NFL.  For example, as the chart below demonstrates, a Commercial Subscriber with a capacity of 51-100 people will be charged $2,314 for the NFL Sunday Ticket,

---

[3] It was announced on August 10, 2015 that DirecTV would begin offering the NFL Sunday Package through an online streaming service for the 2015 NFL football season.  This service will not require subscribers to also purchase a separate DirecTV subscription.  *See* John Breech, CBS Sports, *NFL Sunday Ticket available to more viewers without DirecTV subscription*, Aug. 10, 2015, http://www.cbssports.com/nfl/eye-on-football/25265705/sunday-ticket-now-available-to-almost-anyone-without-directv-subscription.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

compared to only $805 for the MLB Extra Innings package.

| EVO | NFL Sunday Ticket | | | MLB Extra Innings | |
|---|---|---|---|---|---|
| | 1-PAY | 3-PAY | 5-PAY | 1-PAY | 3-PAY |
| 1-50 | $ 1,458.00 | $ 486.00 | $ 291.60 | $ 595.00 | $ 198.33 |
| 51-100 | $ 2,314.00 | $ 771.33 | $ 462.80 | $ 805.00 | $ 268.33 |
| 101-150 | $ 4,630.00 | $ 1,543.33 | $ 926.00 | $1,120.00 | $ 373.33 |
| 151-200 | $ 4,630.00 | $ 1,543.33 | $ 926.00 | $1,600.00 | $ 533.33 |
| 201-350 | $ 6,479.00 | $ 2,159.67 | $ 1,295.80 | $2,080.00 | $ 693.33 |
| 351-500 | $ 9,258.00 | $ 3,086.00 | $ 1,851.60 | $2,400.00 | $ 800.00 |
| 501-750 | $10,419.00 | $ 3,473.00 | $ 2,083.80 | $2,800.00 | $ 933.33 |
| 751-1000 | $13,888.00 | $ 4,629.33 | $ 2,777.60 | $2,800.00 | $ 933.33 |
| 1001-1500 | $20,832.00 | $ 6,944.00 | $ 4,166.40 | $3,600.00 | $ 1,200.00 |
| 1501-2000 | $27,774.00 | $ 9,258.00 | $ 5,554.80 | $3,600.00 | $ 1,200.00 |
| 2001-5000 | $57,864.00 | $19,288.00 | $11,572.80 | $4,800.00 | $1,600.00 |
| 5001-10000 | N/A | $34,138.33 | $20,483.00 | $6,000.00 | $2,000.00 |
| 10000+ | N/A | $40,965.00 | $24,579.00 | $8,800.00 | $2,933.33 |

40.     In the "but for" world without the unreasonable restraint imposed by the exclusivity agreement, both teams and providers would compete for viewership for Out-of-Market Games, which would result in increased options and lower prices.

41.     Indeed, Professor Roger Noll testified at a hearing on "Competition In Sports Programming And Distribution: Are Consumers Winning?" that:

> The relevant benchmark for whether an action is pro- or anti-competitive is the circumstance that would prevail in a competitive world.  The argument that NFL Sunday Ticket increased output is correct, but it increased output in a monopolized market.  The issue is what is the alternative in the absence of monopolization, and in the absence of monopolization, the market for televised NFL games would be like other pro sports were or like college sports are today.  For example, if all broadcasting of college football games were put together into a single package priced at $150 a month and shown exclusively through DirecTV, the effort would be a profit-enhancing reduction in output.  From my perspective, if one adopts the right counterfactual, the right but-for world in the competitive environment, it is obvious that NFL Sunday Ticket is a palliative compared to the output and prices that would exist in a competitive environment.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**D.     The Structure of the Market for the NFL Sunday Ticket**

42.     The relevant geographic market is the United States. The relevant product market is the market for Out-of-Market Games.  As alleged herein, the national broadcast rights to select packages of games are negotiated by the NFL with networks CBS, NBC, ESPN and Fox Broadcasting.  This market includes both live broadcasts and the broadcast rights for Out-of-Market Games, such as those carried in the NFL Sunday Ticket package.  Live broadcasts of other sports or other content do not compete with live broadcasts of NFL games.  Moreover, NFL games broadcast locally on CBS and Fox Broadcasting on Sunday afternoons are not interchangeable with the multi-game offering provided by the NFL Sunday Ticket, specifically because the local games are different from the multi-game offering provided by the NFL Sunday Ticket, which caters to fans that are not located within the geographical confines of their favorite teams' home territories.

43.     DirecTV treats residential and Commercial Subscribers as distinct markets.  DirecTV labels a portion of its website "DirecTV For Business," which has a distinct tab for restaurants and bars.

44.     Although there is undoubtedly some substitution that might occur between broadcasts of in-market games and Out-of-Market Games, the availability of the in-market games does not erode the Defendants' ability to raise the price of Out-of-Market Games above competitive levels.  This is particularly true in the case of Commercial Subscribers, where Plaintiff and the Class need to attract customers with loyalty to a diverse range of NFL teams.

45.     New entrants that would dilute the Defendants' market power established by the collusive agreements alleged herein are extremely unlikely.

46.     Entry into the market would require the creation of a new professional American football league.  Such an undertaking would be enormously expensive and, based on history, very unlikely to succeed.

47.     In the 95 years since the NFL's formation in 1920, there have only

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

been a few noteworthy attempts at entry into the market for American football games.  Three times, once each in the decades of the 1920s, 1930s, and 1940s, an entity calling itself the American Football League ("AFL") was formed, briefly operated and then failed. In 1960 another entry attempt, also under the name AFL, operated independently for nine years before merging with the NFL in 1970.

48.     The United States Football League ("USFL") was founded in 1982 and was disbanded in 1986. It sued the NFL for monopolization and won a jury verdict. *USFL v. NFL*, 842 F.2d 1335 (2d Cir. 1988).  There have also been failed attempts to start and sustain a women's football league and various minor leagues or talent development leagues.  The closest thing to a successful entry is the Arena Football League, which plays a substantially different type of football—indoor football. The Arena Football League began play in 1987 and continued through the 2008 season. The league was reorganized in 2010 and continues today. However, the games of the Arena Football League are played in spring and summer to avoid competition with NFL football broadcasts.  In addition, the Arena Football League produces an altogether different sport that does not compete substantially with the NFL for broadcast audience.

49.     NFL teams are well established and popular, with 32 regionally diverse teams in or near almost every major population center in the United States. There are NFL teams within 18 of the 25 most populous metropolitan areas, dramatically limiting the locations and audiences available to new teams or leagues. Throughout the NFL's long history, not one of the few sporadic attempted entries has been successful at competing for NFL football broadcast audiences.  It is virtually impossible for a new league to form and erode the NFL's market power.

50.     Even if a new entrant did appear, and even if it were sufficiently successful to sustain itself, it is unlikely that the resulting live telecasts of that new product would compete sufficiently with the NFL's broadcasts to dissipate the NFL's market power.

51.     The Defendants' market power will only be reduced if the underlying collusive agreement that establishes their power is invalidated by antitrust authorities, or if the exclusivity agreement that supports that market power is replaced by non-exclusive licenses.

52.     The value of the market power that DirecTV exercises as a result of its exclusivity agreement with the NFL is once again illustrated by the recent acquisition offer for DirecTV from AT&T.  As *Forbes* noted in an October 8, 2014 article:

> DirecTV has renewed its agreement with the National Football League for another 8 years. However, this time around, the price is increased by 50% to around $1.5 billion a year.  This is very expensive and far more than $1 billion that CBS, NBC and Fox pay for their respective NFL coverage.  The satellite company offers to its subscribers the popular *NFL Sunday Ticket*, a sports package that broadcasts NFL regular season games that are not available on local affiliates.  Aided by the NFL, DirecTV has managed to attract customers even at times when other pay-TV operators were losing subscribers.  The extended deal with the NFL will aid to the overall subscriber growth for the company.  Moreover, the agreement was of key importance for DirecTV, as its proposed merger with AT&T to some extent was dependent on this deal.

53.     Indeed, AT&T's $48.5 billion offer to purchase DirecTV contained a clause allowing AT&T to cancel the deal if DirecTV lost its exclusive, collusive contract for the NFL Sunday Ticket.  Specifically, the clause provided: "[t]he parties also have agreed that in the event that DirecTV's agreement for the 'NFL Sunday Ticket' service is not renewed substantially on the terms discussed between the parties, the Company [AT&T] may elect not to consummate the Merger."

**E.     DirecTV's Involvement in the NFL's Scheme**

54.     DirecTV has enabled the NFL teams to maintain their horizontal agreement while at the same time preserving DirecTV's exclusivity.  For example, as the 2011 NFL season approached, the NFL's labor deal with the players' union was expiring and a possible lockout was looming.  DirecTV agreed to pay the NFL $1 billion *even if no games were played* that season.  No other outlet made such an offer.  CBS, ESPN, Fox Broadcasting, and NBC would have paid nothing if no

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    games were played.  DirecTV's promise ensured that owners and league executives

2    would make $1 billion even if the entire season were cancelled.

3        55.      As NFL Commissioner Roger Goodell said in announcing the deal,

4    "[w]e are pleased to continue our partnership with DirecTV . . . DirecTV and NFL

5    Sunday Ticket have served our fans well for 20 years and continue to complement

6    our broadcast television packages." DirecTV Chairman, President and CEO Mike

7    White stated that "[t]his new agreement is a testament to the terrific long-term

8    relationship we have with the NFL . . . NFL Sunday Ticket has always been the

9    centerpiece of DirecTV's sports leadership and we're pleased to continue our

10    relationship with the NFL and be a part of the league's future growth and success."

## F.      There are No Pro-Competitive Justifications for the NFL-DirecTV Exclusivity Agreement

13        56.      The exclusivity agreement between DirecTV and the NFL for the

14    broadcast rights of the NFL Sunday Ticket is necessary only to preserve the

15    exercise of power in the market for Out-of-Market Games created by the NFL

16    teams' anticompetitive agreement.  Without the exclusive deal, the market power

17    created by the collusion among NFL teams would be dissipated by price

18    competition between DirecTV and one or more distributors of broadcasts to

19    customers.

20        57.      There are no procompetitive justifications for the exclusivity

21    agreement.  There is no evidence to show that the agreement was created to assure a

22    quality broadcast of the games offered on the NFL Sunday Ticket, to allow the NFL

23    sufficient oversight of games offered, or any other ostensibly reasonable objective.

24    Nor is the exclusivity agreement between the NFL and DirecTV necessary to

25    ensure the telecast of Out-of-Market Games.  In fact, CBS and Fox are

26    contractually obligated to produce these games and provide over-the-air broadcast

27    of them in local and/or regional markets.  Instead, the agreement was created for the

28    sole purpose of artificially inflating the price of Out-of-Market Games.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

58.     Indeed, the exclusive content enjoyed by DirecTV is rare.  Rob Stecklow, general manager of sports products and marketing for DirecTV, admitted as much: "[i]n this time and era where there's less and less content that's exclusive, the NFL still reigns as some of the best content out there."  The only way Plaintiff and other Class members can view Out-of-Market Games is by purchasing the NFL Sunday Ticket from DirecTV.

59.     Subscribers have expressed concern about the market leverage DirecTV has been able to obtain as a result of its deal with the NFL for Sunday Ticket.  The following exchange between a subscriber and business columnist Steven Pearlstein was reported in a *Washington Post* article:

> What do you make of the current exclusivity arrangement the NFL has with DirecTV to broadcast games? I find that DirecTV will not sell its 'Sunday Ticket' package unless one also purchases a base programming package. I don't feel receiving NFL games on cable is a God-given right, but do feel the NFL is employing monopolistic practices by not opening up the Sunday Ticket to other cable/satellite carriers. When might that arrangement end? Thanks.

> **Steven Pearlstein:** Right now they are using DirecTV as the instrument for extending their football monopoly to the distribution of games on video. They have made it clear, however, that they want to own the distribution channel themselves and now share their monopoly profits with DirecTV. That is their ultimate game plan, which by the way won't include a free, over-the-air broadcast of local team games on local television, unless they are forced to do so.

60.     For years DirecTV has hypocritically fought with its cable industry competitors to ensure that vital access to sports programming on so-called "regional sports networks" ("RSNs") is available to it on a non-exclusive basis.  For example, on August 31, 2012, DirecTV wrote to the Federal Communications Commission ("FCC") in support of a proposed rule extending a ban on vertically integrated cable companies from withholding access to RSNs from other MVPDs, including DirecTV.  In that letter, DirecTV specifically acknowledged the FCC's findings that "potential harm to competition [] results when a cable-affiliated programmer withholds content from rival MVPDs."  DirecTV further explained the findings by an economist it retained, stating that, once DirecTV and other competitors acquired

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

the rights to broadcast San Diego Padres baseball games, DirecTV "gained substantially more subscribers in San Diego . . . than would have been expected based on its subscribership trends in comparable markets."  DirecTV also recognized that the "recent developments in San Diego offer a natural experiment through which to evaluate the effects of gaining access to valuable content."

61.     As DirecTV's own data demonstrates, consumers benefit from the non-exclusive distribution of live sports content through, among other things, increased options when competition is enhanced among MVPDs.

62.     Defendants could achieve any legitimate, pro-competitive goals without their exclusive arrangement.  For example, the NFL Sunday Ticket is offered in Canada on a non-exclusive basis through more than a dozen satellite and cable providers.  And in the United States, other professional football products such as the NFL's "Red Zone" package (which offers views of selected in-game highlights) are offered on a non-exclusive basis as well.

63.     Defendants and their co-conspirators' exclusive agreement has a clear negative impact on competition for Out-of-Market Games, and serves no pro-competitive purpose.  There is no evidence that this agreement was created to assure the quality of the NFL Sunday Ticket or to allow the NFL sufficient oversight, or any other ostensibly permissible objective.  Instead, DirecTV and the NFL entered into the agreement with the intent of maintaining supracompetitive prices for the NFL Sunday Ticket.  And, because all the NFL teams have colluded to offer the package, they have also prevented individual competition by teams selling their own games to broadcasters.

64.     There are several less restrictive alternatives which would achieve any legitimate, procompetitive goals.  Those include permitting teams to contract individually with DirecTV and allowing other distributors to purchase and exhibit the NFL Sunday Ticket package.

65.     Plaintiff seeks to restore competition by ending the collusive

agreement by Defendants that eliminates competition in the distribution of Out-of-Market Games.

## PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY

66.     Plaintiff and the Class were, and continue to be, harmed by Defendants' anti-competitive agreement.  Plaintiff and the Class are direct purchasers of the NFL Sunday Ticket.  The unlawful restraint created by the exclusive arrangement between DirecTV and the NFL causes Plaintiff and the Class to pay a higher, supracompetitive price for Out-of-Market Games than they otherwise would have paid if the agreement were negotiated competitively.

67.     The agreements described herein have restrained horizontal competition between and among the distributors of Out-of-Market Games.  In particular, without the exclusive licenses and other competitive restraints, DirecTV, the television networks, and other MVPDs would compete with each other in the distribution of Out-of-Market Games to a much greater extent than the limited opportunities now available.

68.     The agreements described above do not concern matters of NFL structure and do not concern any unique characteristic or need of football exhibitions.  These anticompetitive restraints are not necessary to the exhibition of football and are not integral to the sport itself.

69.     There are no legitimate, pro-competitive justifications for these exclusive agreements and other competitive restraints, which would justify the anti-competitive harms they create.

## CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following class (the "Class"):

> All DirecTV Commercial Subscribers that purchased the NFL Sunday Ticket from DirecTV, or any current or former subsidiary or affiliate thereof, at any time

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

beginning June 17, 2011 and until the effects of Defendants' anticompetitive conduct described herein cease.

Excluded from the Class are Defendants, their present and former parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, and agencies and instrumentalities.

71.     DirecTV has sold the NFL Sunday Ticket to Class members across the nation during the Class Period. Defendants have charged, and continue to charge, supracompetitive prices for that service.

72.     While Plaintiff does not know the exact number of Class members, due to the nature of the trade and commerce involved, Plaintiff believes there are (at least) thousands of Class members. The exact number of Class members and their identities are known to DirecTV.

73.     The Class is so numerous that joinder of all members is impracticable.

74.     Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

    a.     Whether Defendants and their co-conspirators engaged in and are continuing to engage in a contract, combination, or conspiracy among themselves to fix, raise, maintain or stabilize the prices for the NFL Sunday Ticket by eliminating competition in the relevant market for Out-of-Market Games in the United States;

    b.     Whether Defendants have engaged in and are continuing to engage in a contract, combination, or conspiracy among themselves to fix, raise, maintain or stabilize prices of the NFL Sunday Ticket by preventing any competitor from offering competing products;

    c.     Whether the alleged unlawful agreement in restraint of trade

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

   d. Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiff and the members of the Class;

   e. The effect of the alleged unlawful agreement in restraint of trade on the prices for the NFL Sunday Ticket packages sold during the Class Period;

   f. The appropriate injunctive and related equitable relief for the Class; and

   g. The appropriate Class-wide measure of damages.

75. Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in that they are Commercial Subscribers of DirecTV and paid artificially inflated prices for the NFL Sunday Ticket.

76. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.  Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

77. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

78. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  engender.  The benefits of proceeding through the class mechanism, including

2  providing injured persons or entities with a method for obtaining redress for claims

3  that it might not be practicable to pursue individually, substantially outweigh any

4  difficulties that may arise in management of this class action.

5       79.    The prosecution of separate actions by individual members of the

6  Class would also create a risk of inconsistent or varying adjudications, establishing

7  incompatible standards of conduct for Defendants.

8                        **CLAIMS FOR RELIEF**

9                            **COUNT ONE**

10       **Violation of Section 1 of the Sherman Act (*Per Se*)**

11      80.    Plaintiff repeats the allegations set forth above as if fully set forth

12  herein.

13      81.    Beginning at a time presently unknown to Plaintiff, and continuing

14  through the present, the exact dates being unknown to Plaintiff, Defendants,

15  including the 32 teams that comprise the NFL, and unnamed co-conspirators,

16  entered into a continuing contract, combination or conspiracy in unreasonable

17  restraint of trade with the purpose, intent, and effect of restraining competition in

18  the market for Out-of-Market Games, in violation of Section 1 of the Sherman Act

19  (15 U.S.C.§ 1).

20      82.    Defendants' contract, combination or conspiracy has resulted in an

21  agreement understanding, or concerted action between and among Defendants that

22  the NFL Sunday Ticket will be provided by DirecTV exclusively.  The agreement

23  forbids any other competing MVPD from offering the same product.

24      83.    The contract, combination or conspiracy alleged herein has substantial

25  horizontal elements, including agreements between the 32 NFL teams, to limit

26  competition between and among the member teams, who would otherwise be

27  competitors for Out-of-Market Games.

28      84.    Defendants' contract, combination or conspiracy has also

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

unreasonably restrained or eliminated competition between and among DirecTV and its potential competitors in violation of Section 1 of the Sherman Act.

85.     Defendants' contract, combination or conspiracy has created anticompetitive effects, including increased prices and reduced output, and otherwise caused injury to consumers and competition in the relevant market and elsewhere.

86.     The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

87.     In formulating and carrying out the alleged contract, combination or conspiracy, Defendants and their co-conspirators did the things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

88.     Defendants' unlawful agreement in restraint of trade had the following effects, among others:

        a.     Price competition in the market for Out-of-Market Games has been restrained, suppressed and/or eliminated in the United States;

        b.     Prices for the NFL Sunday Ticket have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

        c.     Plaintiff and members of the Class that purchased the NFL Sunday Ticket have been deprived of the benefits of free and open competition.

89.     The Defendants' contract, combination or conspiracy occurred in or affected interstate commerce in the United States.

90.     The alleged contract, combination or conspiracy is a *per se* violation of the federal antitrust laws.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

91.     Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of inflated, supracompetitive prices for the NFL Sunday Ticket and reduced choice.  Plaintiff and other similarly situated Class members have been injured and will continue to be injured in their business and property by paying more for the NFL Sunday Ticket than they would have paid and will pay in the absence of the conspiracy.

92.     Plaintiff and members of the Class are entitled to an injunction against Defendants to prevent and restrain the violations alleged herein.

## COUNT TWO

### Violation of Section 1 of the Sherman Act (Rule of Reason)

93.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

94.     Beginning at a time presently unknown to Plaintiff, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and unnamed co-conspirators, entered into a continuing contract, combination or conspiracy in unreasonable restraint of trade with the purpose, intent, and effect of restraining competition in the market for Out-of-Market Games, in violation of Section 1 of the Sherman Act (15 U.S.C.§ 1).

95.     Defendants' contract, combination or conspiracy has resulted in an agreement understanding, or concerted action between and among Defendants that the NFL Sunday Ticket will be provided by DirecTV exclusively.  The agreement forbids any other competing MVPD from offering the same product.  Thus, Defendants' contract, combination or conspiracy has unreasonably restrained or eliminated competition between and among DirecTV and its potential competitors in violation of Section 1 of the Sherman Act.

96.     The relevant geographic market is the United States.  The relevant product market is the market for Out-of-Market Games.  The Defendants explicitly recognize this product market.  The Defendants direct advertising and marketing

dollars towards this market and to Commercial Subscribers specifically.

97.   Defendants' contract, combination or conspiracy has created anticompetitive effects, including increased prices and reduced output, and otherwise caused injury to consumers and competition in the relevant market and elsewhere.

98.   The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

99.   In formulating and carrying out the alleged contract, combination or conspiracy, Defendants and their co-conspirators did the things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

100.   Defendants' conspiracy had the following effects, among others:

a.   Price competition in the market for Out-of-Market Games has been restrained, suppressed and/or eliminated in the United States;

b.   Prices for the NFL Sunday Ticket have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

c.   Plaintiff and members of the Class that purchased the NFL Sunday Ticket have been deprived of the benefits of free and open competition.

101.   The Defendants' contract, combination or conspiracy occurred in or affected interstate commerce in the United States.

102.   Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of inflated, supracompetitive prices for the NFL Sunday Ticket and reduced choice.  Plaintiff and other similarly situated Class members have been injured and will continue to be injured in their business and

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  property by paying more for the NFL Sunday Ticket than they would have paid and
2  will pay in the absence of the conspiracy.

3  103. There are no pro-competitive justifications for Defendants' exclusivity
4  agreement.

5  104. Plaintiff and members of the Class are entitled to an injunction against
6  Defendants to prevent and restrain the violations alleged herein.

7  WHEREFORE, Plaintiff demands judgment that:

8  1. That the Court determines that this action may be maintained as a
9  Class action under Rule 23 of the Federal Rules of Civil Procedure, and that
10 Plaintiff be named as representative of the Class;

11 2. That the contract, combination or conspiracy, and the acts done in
12 furtherance thereof by Defendants and their co-conspirators as alleged herein, be
13 adjudged and decreed an unreasonable restraint of trade or commerce in violation
14 of Section 1 of the Sherman Act;

15 3. That Plaintiff and members of the Class recover damages, to the
16 maximum extent allowed under the law, and that a joint and several judgment be
17 entered in favor of Plaintiff and members of the Class against Defendants for three
18 times the amount of damages sustained by Plaintiff and members of the Class as
19 allowed by law, together with the costs of this action, including reasonable
20 attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15
21 and 26);

22 4. That Plaintiff and members of the Class be awarded pre- and post-
23 judgment interest as provided by law, and that such interest be awarded at the
24 highest legal rate from and after the date of service of this Complaint;

25 5. That Defendants and their co-conspirators, affiliates, successors,
26 transferees, assignees and other officers, directors, partners, agents and employees
27 thereof, and all other persons acting or claiming to act on their behalf or in concert
28 with them, be permanently enjoined from further violations of the antitrust laws,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

including being restrained from and in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and,

6. That Plaintiff and members of the Class have such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial on all matters so triable.

Respectfully submitted,

DATED:  August 13, 2015

**ROBINS KAPLAN LLP**

By:  /s/ David Martinez

Roman M. Silberfeld, Bar No. 62783
David Martinez, Bar No. 193183
**ROBINS KAPLAN LLP**
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
Telephone: (310) 552-0130
Fax: (310) 229-5800
RSilberfeld@RobinsKaplan.com
DMartinez@RobinsKaplan.com

Hollis Salzman (*pro hac vice* pending)
Kellie Lerner (*pro hac vice* pending)
Michelle C. Zolnoski (*pro hac vice* pending)
**ROBINS KAPLAN LLP**
601 Lexington Avenue
Suite 3400
New York, NY  10022
Telephone: (212) 980-7400
Fax: (212) 980-7499
HSalzman@RobinsKaplan.com
KLerner@RobinsKaplan.com
MZolnoski@RobinsKaplan.com

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2
John Radice (*pro hac vice* pending)
Kenneth Pickle (*pro hac vice* pending)

3
**RADICE LAW FIRM**
34 Sunset Boulevard

4
Long Beach, NJ 08008
Telephone: (646) 245-8502

5
Fax: (609) 385-0745
JRadice@radicelawfirm.com
KPickle@radicelawfirm.com

6

7
*Attorneys for Plaintiff and the Putative Class*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES